TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

------------------------------
:
OPINION             :
:
of               :
:
JOHN K. VAN DE KAMP   :     No. 87-1207
Attorney General      :
:     JULY 7, 1988
RODNEY O. LILYQUIST   :
Deputy Attorney General  :
:

------------------------------------------------------------------

THE HONORABLE DOUGLAS J. MALONEY, COUNTY COUNSEL, MARIN COUNTY, has requested an opinion on the following question:

Does a person who fails to leave the common areas of a public housing project when requested to leave by a peace officer acting at the request of the housing authority board of commissioners violate Penal Code section 602, subdivision (n)?

CONCLUSION

A person who fails to leave the common areas of a public housing project when requested to leave by a peace officer acting at the request of the housing authority board of commissioners violates Penal Code section 602, subdivision (n), if the area is in fact not open to the general public and the person has no lawful right to be there.

ANALYSIS

Penal Code section 602 [1] states in part:

"Every person who willfully commits a trespass by any of the following acts is guilty of a misdemeanor:

_____

[1] All references hereafter to the Penal Code are by section number only.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"(n) Refusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another <u>and not open to the general public,</u> upon being requested to leave by (1) a peace officer at the request of the owner, the owner's agent, or the person in lawful possession, and upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent, or the person in lawful possession, or (2) the owner, the owner's agent, or the person in lawful possession. The owner, the owner's agent, or the person in lawful possession shall make a separate request to the peace officer on each occasion when the peace officer's assistance in dealing with a trespass is requested. However, a single request for a peace officer's assistance may be made to cover a limited period of time not to exceed 30 days and identified by specific dates, during which there is a fire hazard or the owner, owner's agent or person in lawful possession is absent from the premises or property. In addition, a single request for a peace officer's assistance may be made for a period not to exceed six months when the premises or property is closed to the public and posted as being closed. However, this subdivision shall not be applicable to persons engaged in lawful labor union activities which are permitted to be carried out on the property by the California Agricultural Labor Relations Act, Part 3.5 (commencing with Section 1140) of Division 2 of the Labor Code, or by the National Labor Relations Act.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ."  (Emphasis added.)

The question we are asked to resolve concerns the possible application of section 602, subdivision (n), to the common areas of a public housing project. Do such areas constitute "real property . . . not open to the general public" for purposes of the statute? We conclude that they may, depending upon the individual circumstances present.

Under the Housing Authorities Law (Health & Saf. Code, §§ 34200-34380), a housing authority "constitutes a corporate and politic public body, exercising public and essential governmental functions" (Health & Saf. Code, § 34310; see <u>Housing Authority</u> v. <u>City of L.A.</u> (1952) 38 Cal.2d 853, 861-864; <u>People</u> v. <u>Holtzendorff</u> (1960) 177 Cal.App.2d 788, 798-799). Among its duties and responsibilities, a housing authority acts as an agency of the state to "acquire, lease, and operate housing projects for persons of low income" and in connection therewith "[p]rovide the security which the authority deems necessary for the protection of a project and its inhabitants." (Health & Saf. Code, § 34312, subds. (a), (f); see <u>Dyas</u> v. <u>Superior Court</u> (1974) 11 Cal.3d 628, 633-634; <u>Boxx</u> v. <u>Board of Administration</u> (1980) 114 Cal.App.3d 79, 87-88.)

We are informed that a housing authority board of commissioners questions the applicability of section 602 to the common areas of one of its projects. The housing project encompasses 32 acres, 27 buildings, 293 living units, patios, courtyards, playgrounds, tennis courts, outdoor barbecue pits, parking lots, and extensive lawns and walkways. No physical barriers such as walls with security gate systems surround the project. Currently public and private property near

the project is used by persons (who are not residents in the project) for conducting various criminal activities, principally selling drugs to other nonresidents. The housing authority, its staff, and the residents seek to exclude these nonresidents from coming upon and using the common areas (those areas outside the individual living units) of the project. May the provisions of subdivision (n) of section 602 be applied for such exclusion?

The offense specified in subdivision (n) of section 602 was described by the Court of Appeal in People v. Medrano (1978) 78 Cal.App.3d 198, 215:

> "'Refusal to leave' is one of a variety of trespasses described by section 602. The other varieties involve some guilty foreknowledge, such as malicious mischief, disregard of posted warnings or unlawful occupancy. Subdivision (n) envisions an originally innocent entry, followed by an unlawful sojourn after refusal of requests to leave."[2]

When this type of trespass was first incorporated into section 602 in 1970 (Stats. 1970, ch. 607, § 1), it required dual requests to leave, one from a peace officer and one from "the owner, his agent, or the person in lawful possession thereof." The legislative purpose of the 1970 enactment was in part to address the situation presented in People v. Brown (1965) 236 Cal.App.2d Supp. 915. (See Note, Review of Selected 1970 California Legislation (1971) 2 Pacific L.J. 275, 371-372.) Brown held that the type of trespass defined in section 602 as "[e]ntering and occupying real property or structures of any kind without the consent of the owner" was inapplicable where the person had the owner's consent to enter the property. Accordingly, with the 1970 amendment of section 602, a lawful entry would not prevent application of the statute if the person failed or refused to leave the property after being requested to do so.

The misdemeanor offense defined in subdivision (n) of section 602 contains the following elements: (1) physical presence on land, real property, or structures, (2) the property must belong to someone else, (3) the property must not be open to the general public, (4) a request to leave must be given by the appropriate authority, and (5) the person must refuse or fail to leave. Each of the five elements requires proof in any prosecution of the offense. The present inquiry assumes the existence of elements (1), (2), (4), and (5). It is only element (3) that concerns us.[3]

No reported case has focused upon the requirement of subdivision (n) that the property "not [be] open to the general public." Cases interpreting other statutes suggest that

---

[2]Medrano was disapproved on other grounds in Vista Verde Farms v. Agricultural Labor Relations Bd. (1981) 29 Cal.3d 307, 325, footnote 8.

[3]As indicated in People v. Medrano, supra, 78 Cal.App.3d 198, 215, a person may initially have a "right" to be in a particular area but still violate subdivision (n) of section 602 if the right is withdrawn. For our purposes, we may assume that the person has no independent legal right to remain on the property.

common areas of a public housing project would not be considered property not open to the general public. In People v. Perez (1976) 64 Cal.App.3d 297, 300-301, for example, the court analyzed the meaning of "public place" for purposes of the criminal offense of being "found in any public place under the influence of intoxicating liquor." The court stated:

"In the context of section 647, subdivision (f), California courts have defined a public place variously as '[c]ommon to all or many; general; open to common use' (In re Zorn, 59 Cal.2d 650, 652 (barbershop is a public place); see In re Koehne, 59 Cal.2d 646, 649; 'a place where the public has a right to go and to be . . . . [o]pen to the free and unrestricted use of the public' (People v. Belanger, 243 Cal.App.2d 654, 657 (inside a parked automobile on a public street is a public place); and a place where a 'stranger . . . was able to walk through the outside area of [a] home to the front door without challenge.' (People v. Olson, supra, 18 Cal.App.3d at 598 (area outside private home, including lawn, driveway or front porch is a public place).)

"New York's former public intoxication statute has been construed to define a public place as one where the public has a right to go, not necessarily a place solely for the use of the public, but a place which is merely accessible to the neighboring public. (People v. Soule (1913) 30 N.Y. Crim. 214 [142 N.Y.S. 876, 800].) In People v. Richardson (1951) 104 N.Y.S.2d 336, 339, a defendant who used abusive language and threats against a neighbor in violation of the disorderly conduct statute in the interior hallway of their multiple unit dwelling was held to have committed a breach of the peace and the hallway held to be a public place within the context of the statute. Hallways of multiple unit dwellings have also been considered public places within a trespass statute. (People v. Beltrand (1970) 314 N.Y.S.2d 276, 283.)

"The hallway in this case is the kind of public place contemplated in the California and New York cases. There were no locked gates or doors to keep the public from entering. Hallways and stairways of multiple dwellings are open to delivery men, service men, solicitors, visitors and other strangers, whether those hallways are interior or exterior to the buildings, and are therefore public places within the meaning of section 647, subdivision (f). In other words, a 'public place' within the meaning of this subdivision is a location readily accessible to all those who wish to go there rather than a place which the general public frequents." (Fns. omitted.)

In People v. Brown (1979) 88 Cal.App.3d 283, 290-291, the court examined whether the search of a patient's hospital room by police officers was an invasion of the patient's right of privacy:

"As this court has previously noted, a refined analysis of the hospital setting is required -- one that acknowledges both private and public areas. 'Many areas of a hospital are public places and as such are not areas subject to constitutional protection from entry without warrant for either arrest or search and seizure.

[Citations.] The public hallway where the officers waited was clearly such an area. There can, of course, be private areas within public places . . . offered to the public for private, although transient, individual use [citation], where general or routine clandestine observation to detect criminal acts is both an unlawful search and an invasion of the constitutional right of privacy.' (People v. Schad (1971) 21 Cal.App.3d 201, 209.) The question this case asks is whether a hospital room is 'public,' 'private' or something in between.

"The test for determining whether a given area is cloaked with the occupant's expectation of privacy is not the occupant's mere subjective, unmanifested expectation (Dean v. Superior Court (1973) 35 Cal.App.3d 112, 117), but an objective test drawn from the circumstances. Thus, our Supreme Court has taught, 'Taking into account the nature of the area surrounding a private residence, we ask whether that area has been opened to public use; if so, the occupant cannot claim he expected privacy from all observations of the officer who stands upon that ground; if not, the occupant does deserve that privacy.' (Lorenzana v. Superior Court, supra, 9 Cal.3d at p. 638.)

"  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"A hospital is, in a sense, sui generis. It is unlike a motel room for instance, which is rented with the implicit right to keep all others out. The patient knows and expects that nurses, doctors, food handlers, and others enter and leave 'his' hospital room in accordance with the medical needs of the patient and the hospital routine. On the other hand, a hospital room is clearly not a public hall which anyone in the building is free to use as needed. Thus, at least for certain purposes, a hospital room is fully under the control of the medical staff; yet for other purposes it is 'the patient's room.' For this reason, it is not inappropriate to view a hospital room as one within joint dominion, at least for certain purposes." (Fn. omitted.)

In Brown the court upheld the search of the patient's room based upon the particular facts involved. (Id., at pp. 291-292.) In People v. Kemick (1971) 17 Cal.App.3d 419, 421-422, the court held that the emergency room of a hospital was a "public place" within the meaning of the "under the influence" offense analyzed in Perez. We have also found hospitals and other medical facilities to be "places to which the general public is invited" for purposes of protecting a right of access for disabled persons. (70 Ops.Cal.Atty.Gen. 104, 106-107 (1987); see also 65 Ops.Cal.Atty.Gen. 106, 109-110 (1982); 65 Ops.Cal.Atty.Gen. 72, 73-75 (1982).)

We are not persuaded, however, by these decisions and opinions construing the meaning of different language used for other legislative purposes.[4] With respect to the "under the

---

[4]In Lampley v. Alvares (1975) 50 Cal.App.3d 124, 128, the court reaffirmed:

influence" criminal offense, for example, a major purpose of the law "is to protect the offender himself from the results of his own folly." (People v. Belanger (1966) 243 Cal.App.2d 654, 662; accord People v. Olson (1971) 18 Cal.App.3d 592, 597; People v. Kelly (1969) 3 Cal.App.3d 146, 150.) Such purpose is lacking when seeking to apply subdivision (n) of section 602. We are directed to interpret the language of the latter statute with its purposes in mind, not to further the purposes of some unrelated statute. (See People v. Woodhead (1987) 43 Cal.3d 1002, 1007; People v. Overstreet (1986) 42 Cal.3d 891, 895.) Accordingly, even though the common areas of a public housing project may be considered a "public place" for purposes of section 647 (see People v. Olson (1971) 18 Cal.App.3d 592, 596-598), the areas may nonetheless constitute "real property . . . not open to the general public" for purposes of subdivision (n) of section 602.

We reject the suggestion that all property owned and operated by a public entity must necessarily be considered "open to the general public." Subdivision (n) of section 602 does not speak in terms of publicly owned property or privately owned property but whether the "land, real property, or structures" is "open to the general public" regardless of who may own or lawfully occupy it.[5] In Adderley v. Florida (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242], the United

---

"'"There is no rule of law that necessarily requires the same meaning to be given to the same word used in different places in the same statute" [citations], much less the same word used in different statutes relating to essentially different matters and subject to different construction.' [Citation.]"

[5]We have examined the legislative history of the amendment of section 602 that added the language in question. At the time of its enactment, the author of the legislation described its purpose as protecting both private and public property:

"SB 551 represents an attempt to make our laws more effective in the control of trespassers. Property owners (be they public or private), under existing provisions of state law, are limited in their legal recourse relative to persons coming on their property without their consent. Recent interpretations of state statutes have held that occupation of land by someone other than the owner must be continuous, and some degree of dispossession and permanency must be intended, to be considered trespassing. Under these interpretations, a person can enter property, remain for a period of time (sometimes an extended period), and as long as his intention was not for permanent occupation and no degree of dispossession was intended, trespass laws are not violated.

"SB 551 seeks to clarify our trespass laws to insure that the rights of the property owner are adequately protected. . . . It will be a trespass to refuse to leave property or structures belonging to, or lawfully occupied by another and not open to the general public, upon being requested to leave by the owner and a peace officer who has been summoned.

States Supreme Court upheld the conviction of persons prosecuted under a Florida trespass statute for refusing to leave the grounds of a county jail. In language now often quoted, the court stated:

> "Nothing in the Constitution of the United States prevents Florida from even-handed enforcement of its general trespass statute against those refusing to obey the sheriff's order to remove themselves from what amounted to the curtilage of the jailhouse. The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated . . . . The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." (Id., at pp. 47-48, fns. omitted, emphasis added.)

Like other property owners, then, a public entity may close to the general public portions of its property for lawful and nondiscriminatory purposes. (See U.S. Postal Service v. Greenburgh Civic Assns. (1981) 453 U.S. 114, 129 [69 L.Ed.2d 517, 101 S.Ct. 2676]; Cox v. Louisiana (1965) 379 U.S. 536, 554-555, 563-564 [13 L.Ed.2d 471, 85 S.Ct. 453]; In re Ball (1972) 23 Cal.App.3d 380, 386-387; Parrish v. Municipal Court (1968) 258 Cal.App.2d 497, 504.)

As stated in Adderley, whether public property is open to the general public would primarily depend upon its designated use and purpose. Government owned property has a wide range of uses: streets, sidewalks, parking lots, parks, airports, stadiums, courthouses, police stations, prisons, fire stations, schools, employment offices, libraries, post offices, and hospitals, to name a few. The fact that publicly owned property may be open to the general public in its use as a street does not mean that publicly owned property is open to the general public in its use as a prison. Here the purpose of the property owned and operated by the housing authority is to provide housing accommodations for a limited number of persons of low income, not to provide a park and recreational facilities for any and all members of the "general public." (Health & Saf. Code, § 34312.)

Indeed, it is not suggested that the individual residences within a public housing project are "open to the general public." These units are, of course, rented by the residents, and members of the general public are excluded from them by walls, doors, and other physical barriers. We do not believe, however, that a housing authority must erect walls with security gates around the common areas in order to meet the "not open to the general public" requirement of section 602, subdivision (n).

---

"This measure enjoyed the support of numerous public agencies (I introduced it at the request of the City of Los Angeles). In addition, support was communicated to me by many private landowners and by a number of higher education institutions, who feel that it will help them in meeting the problem of having their land and buildings occupied by 'demonstrators.'" (Emphases added.)

In our opinion the common areas of a public housing project would be subject to the same considerations as the front lawn and walkway of the typical residence found throughout the state. Generally, these areas are for the use of the residents and the limited number of persons who have the permission of the owners or residents to be there. Even strangers, such as salespersons, may have implied permission to be present under narrowly defined conditions without the areas being "open to the general public" under section 602. Use by others is typically based upon some perceived benefit to the owners or residents, not solely upon some independent benefit to the nonresident. Indiscriminate usage by any and all members of the general public is not contemplated, whether the "common areas" are located in and around a public housing project, an apartment complex, a townhouse condominium development, or single-family detached dwelling.

The most analogous situation we have found concerns the question of whether a public facility is "used by the general public" for purposes of requiring access by disabled persons pursuant to Health and Safety Code section 19955. In 65 Ops.Cal.Atty.Gen. 72 (1982), we examined that issue with respect to a recreational facility located within a mobilehome park:

> "Undoubtedly that facility is open to a more general class than the residents of the park, for surely it is available to their families and invited guests. Use by the expanded group of persons in our view, however, does not reach the use 'by the general public' spoken of in section 19955. There are still meaningful restrictions on who may use the facilities, which considerably narrows their amenability to user from being generally available to the public--as is the case with an auditorium, hospital, theater, restaurant, hotel, motel, stadium or convention center--to being available to a select and definable few. Furthermore, unlike those facilities, the purpose for whose creation is based upon their being made continuously available to the general public and whose economic viability cannot survive without their being so available, the recreation center at a mobilehome park is neither so created nor dependent. Rather, it is a secondary appendage to another unit, the park itself which, like it, neither contemplates nor needs accessibility of continuous use by the general public for its sustenance. Thus, we do not believe the fact that a recreation building in a mobilehome park might well be used by the residents' families, friends, and invited guests makes it 'a building . . . or facility used by the general public' or a 'public facility or accommodation' within the meaning of section 19955." (Id., at p. 75.)

Similar to the analysis in our prior opinion, we find that the common areas of a public housing project may be subject to meaningful restrictions in usage -- the residents and their guests are a limited group and are not the "general public" as that term is used in section 602, subdivision (n). (See People v. Brown (1979) 88 Cal.App.3d 283, 290-291; Bauman v. Beaujean (1966) 244 Cal.App.2d 384, 389; Com. v. Hood (1983) 389 Mass. 581 [452 N.E.2d 188, 191-195]; State v. Marley (1973) 54 Hawaii 450 [509 P.2d 1095, 1103-1104]; City of Chicago v. Rosser (1970) 47 Ill.2d 10 [264 N.E.2d 158, 160-162].)

As already indicated, whether a specific parcel of real property is "open to the general public" under section 602 would depend upon the individual facts involved. The primary consideration would be the designated use and purpose of the property. While certain portions of property may be open to the general public such as in their use as walkways, other portions of the same property may be closed to the general public such as in their use as recreational facilities. With respect to the housing project in question, we are informed that the board of commissioners of the housing authority has adopted a resolution declaring all property of the housing authority "not open to the general public." Such a resolution would be an exercise of the legislative authority of the board (see Health & Saf. Code, § 34311), would be in keeping with the limited statutory uses of the property (see Health & Saf. Code, § 34312), and would be consistent with the responsibility to "[p]rovide the security . . . necessary for the protection of a project and its inhabitants" (Health & Saf. Code, § 34312, subd. (f)). Additional facts would also be pertinent -- other resolutions or regulations of the board, the lease agreements with tenants, deed dedications, physical barriers, signs, common usage, the presence and actions of security guards, and various other circumstances -- in determining whether all portions of the particular common areas were or were not open to the general public.

Finally, we observe that "the freedom of speech or of the press; or the right of the people peacefully to assemble" is guaranteed by the First Amendment. (U.S. Const., 1st Amend.; see Cal. Const., art. I, §§ 2, 3.) It has been repeatedly held, however, that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." (U.S. Postal Service v. Greenburgh Civic Assns., supra, 453 U.S. 114, 129.) For a discussion of the applicable principles relating to the exercise of First Amendment rights upon publicly owned property, see Cornelius v. NAACP Legal Defense & Ed. Fund (1985) 473 U.S. 788, 799-808 [87 L.Ed.2d 567, 105 S.Ct. 3439]; Clark v. Community For Creative Non-Violence (1983) 468 U.S. 288, 293-297 [82 L.Ed.2d 221, 104 S.Ct. 3065]; United States v. Grace (1983) 461 U.S. 171, 177-181 [75 L.Ed.2d 736, 103 S.Ct. 1702]; Perry Educ. Assn. v. Local Educators' Assn. (1983) 460 U.S. 37, 45-46 [74 L.Ed.2d 794, 103 S.Ct. 948]; Heffron v. International Soc. For Krishna Consc. (1980) 452 U.S. 640, 650-651 [69 L.Ed.2d 298, 101 S.Ct. 2559]; U.C. Nuclear Weapons Labs. Conversion Project v. Laurence Livermore Laboratory (1984) 154 Cal.App.3d 1157, 1162-1165; Tribe, American Constitutional Law (1978) pp. 690-691; Note, The Public Forum: Minimum Access, Equal Access, and the First Amendment (1975) 28 Stan.L.Rev. 117. Suffice it to say, no claim is made here that section 602, subdivision (n) would be applied to deny First Amendment rights. (See U.S. Postal Service v. Greenburgh Civic Assns., supra, 453 U.S. 114, 131, fn. 7; Cox v. Louisiana (1965) 379 U.S. 559, 563 [13 L.Ed.2d 487, 85 S.Ct. 476].)

In answer to the question presented, therefore, we conclude that a person who fails to leave the common areas of a public housing project when requested to leave by a peace officer acting at the request of the housing authority board of commissioners violates section 602, subdivision (n), if the area is in fact not open to the general public and the person has no lawful right to be there.

* * * * *